Michael O. Stevens, OSB No. 095198
michael@hillsborofirm.com
STEVENS & LEGAL, LLC
3699 NE John Olsen Avenue
Hillsboro, OR 97124
Tel: (971) 533-6178
Fax: (971) 228-2608

J. Curtis Edmondson, CASB No. 236105 (*pro hac vice*)
jcedmondson@edmolaw.com
Kiren Rockenstein, OSB No. 175638
kirenr@edmolaw.com
EDMONDSON IP LAW
3699 NE John Olsen Avenue
Hillsboro, OR 97124
Tel: (503) 336-3749
Fax: (503) 482-7418

David H. Madden, OSB No. 080396
dhm@mersenne.com
MERSENNE LAW LLC
9600 SW Oak Street, Suite 500
Tigard, OR   97223
Tel: (503) 679-1671
Fax: (503) 512-6113

Attorneys for Defendant JOHN HUSZAR

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **DALLAS BUYERS CLUB, LLC,**<br><br>         Plaintiff,<br>v.<br><br>**JOHN HUSZAR,**<br><br>         Defendant. | Case No.: **3:15-cv-0907-AC**<br><br>DEFENDANT'S REPLY IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT<br><br>FRCP 56<br><br>**ORAL ARGUMENT REQUESTED** |

# REPLY

## I. INTRODUCTION

Defendant John Huszar ("Huszar") moved this Court for an order granting summary judgment under three alternate grounds: (1) atatutory immunity under 17 U.S.C 512(a) and (b) due the installation of Tor on his computer system; (2) a lack of admissible depository copy of the work, establishing that Defendant Dallas Buyers Club, LLC ("DBC") cannot present its case in chief; (3) the inadmissibility of the MaverickMonitor data in view of the testimony of DBC's 30(b)(6) designee, Robert Young. DBC timely filed their opposition on each point.

Huszar contends the use of Tor provides absolute immunity under 17 U.S.C 512, even in view of the Requests for Admissions ("RFAs"). Also, DBC never produced, or even argued, that a valid depository copy was turned over at the close of discovery, thus they cannot present their case in chief. Lastly, Bunting's "report" should not be used to rebut Huszar's contentions on MSJ as it relies on data that should have been produced in discovery. If the Court agrees on any one of these points, then summary judgement should be granted in favor of Huszar.

## II. ARGUMENT

### A. HUSZAR'S ALLEGEDLY "DEEMED ADMITTED" RFA'S DO NOT NEGATE THE STATUTORY IMMUNITY UNDER 17 U.S.C. §§ 512(A) AND 512(B) AS A CONSEQUENCE OF HIS INSTALLATION OF TOR

DBC does not dispute the hardware installed on Huszar's server rack participated in / served as part of the Tor Network, since these facts are undisputed.

This Court made the following factual findings earlier in the case in which both parties can rely:

> On the Infringing Machine, Defendant installed Tor Network software and created a "Tor Node," which facilitates use of the Tor Network by end users by routing information through Defendant's machine. Also on this machine were VMs for two email servers. The Infringing Machine had two hard drives, which

> were mirrored. Defendant did not use the Infringing Machine as a personal computer and did not attach any personal computer to this machine. The Infringing Machine was located on a server rack.
>
> (Order on February 6, 2017; Docket 95, page 5)

As there is a factual finding about Tor, this leads to the next question – what effect does the Tor software have on the underlying computer system?

Tor creates an anonymous network through which any two users may communicate. (See Docket 138-8, Page 4, "Onion routing is an approach to low-latency anonymous communication on public networks."; See also https://en.wikipedia.org/wiki/Tor_(anonymity_network). Tor, from a technical perspective, anonymizes the underlying computer data and permits participating computers, or "nodes," to provide an anonymous network through which third parties can transmit data. This fact is undisputed. How Tor works has been cited by a number of appellate courts, mostly in a negative light, but the technology is obviously content neutral, just as the Internet itself is content neutral. (See *United States v. Horton*, 863 F.3d 1041, 1045 (8th Cir., 2017); *United States v. Levin*, 874 F.3d 316 (1st Cir., 2017); describing the Tor technical features in connection with Operation Playpen).

DBC claims the RFAs should trump this factual finding to negate the statutory immunity. (Opposition, Docket 144, pages 3-5). Assuming for the purposes of this motion that RFAs 5 & 7 are deemed admitted, Huszar still prevails under statutory defense of 17 U.S.C. 512(a) and (b) since every ISP and communications company (such as Comcast, AT&T, etc.) relies on that defense.

Everyday, huge volumes of non-infringing and infringing material flow between computer systems using the Internet. A good description can be found at *U.S. Telecom Ass'n v. Fed. Commc'ns Comm'n,* 825 F.3d 674,689 (D.C. Cir., 2016) stating:

REPLY IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
Page 3

> To bring this all together, when an end user wishes to check last night's baseball scores on ESPN.com, his computer sends a signal to his broadband provider, which in turn transmits it across the backbone to ESPN's broadband provider, which transmits the signal to ESPN's computer. Having received the signal, ESPN's computer breaks the scores into packets of information which travel back across ESPN's broadband provider network to the backbone and then across the end user's broadband provider network to the end user, who will then know that the Nats won 5 to 3.

In that example, once can replace, ESPN.com, with any provider of data. Thus, the internet backbone is a mere conduit – it does not differentiate between infringing and non-infringing data.

Huszar, like the internet providers, is not the "end user" of the data, due to his installation of Tor. Tor makes his computer part of the "broadband provider network" and is just a conduit of data for the end-user. Huszar, by virtue of installing Tor, is a mere conduit for other users as he just routes their requests. As part of the "provider network", Huszar should be given the same statutory immunities under 17 U.S.C. § 512(a) and § 512(b).

This issue seems to be one of first impression for the Federal Courts. It has been addressed very well academically, see Notes and Comments, Northwestern School of Law, Vol 106, No. 2, by Nassim Nazemi, *DMCA § 512 SAFE HARBOR FOR ANONYMITY NETWORKS AMID A CYBER-DEMOCRATIC STORM: LESSONS FROM THE 2009 IRANIAN UPRISING*, attached as Exhibit 1.

Like an oracle, Ms. Nazemi predicted that: "…Because the Digital Millennium Copyright Act (DMCA)12 was not drafted with Tor in mind and because no anonymity network operator has yet faced secondary liability in a copyright infringement action, it is unclear whether Tor's volunteer operators will be exempt from liability under DMCA § 512(a), a provision giving safe harbor to transitory digital network communication providers…." Ms. Nazemi also predicted in her article: "*…Thus, Tor operators may soon find themselves in court facing damages of up to*

*$150,000 per illegally copied movie.*" (*Id*. at 873)  and  "*…Exit node operators face the greatest risk of liability because all Tor users take on the IP address of their exit node operator. In other words,*" and  "*…[w]hen someone does something improper via Tor, the exit node operator often gets blamed…*". (*Id*. at 875).   Ms. Nazemi opines that a Tor operator should be immune under 17 U.S.C. § 512(a).

In conclusion, even if we accept the RFAs are deemed admitted, there is no legal liability due to Huszar's operation of Tor. Like the UPS, FedEx, or the Post Office, Huszar should not be held liable for just delivering a copy of *Dallas Buyers Club* to an end-user.

Huszar respectfully requests that this Court grant summary judgment in his favor in view of the statutory immunities provided under the DMCA.

B. **DBC'S FAILURE TO PRODUCE THE DEPOSITORY COPY OF THE MOVIE BY THE CLOSE OF DISCOVERY PREVENTS THEM FROM PRESENTING THEIR CASE IN CHIEF**

DBC confuses legal title to a work with the work itself.  See *Fathers & Daughters Nev., LLC v. Zhang 3:16-cv-1443-SI* (D. Or., 2018) for a more than thorough analysis on the effect agreements on the issue of title and standing.  At issue here is not clear title, as in in *Fathers*, but what physical evidence can DBC introduce at trial, such evidence being the foundation of their copyright claim e.g. the motion picture *Dallas Buyers Club*.

At trial, DBC will have to admit at least two pieces of evidence – the movie for which a records custodian can lay the foundation, and records that establish title. DBC will first lay the foundation for the title of the work (the copyright certificate).  DBC claims the copyright certificate establishes clear title. For the purposes of this MSJ, that is undisputed. Then, DBC will have to introduce the underlying work itself, the film *Dallas Buyers Club*, along with the proper

foundation. The jury will then examine what portions DBC alleges Huszar infringed (arguably reconstructed from a PCAP) and make a determination on infringement.

By the close of discovery, DBC failed to produce the depository copy of the work. (See Docket 118). In DBC's opposition to this motion, there was no argument on what evidence was produced in discovery and how proper foundation is laid. When the movant presents evidence, it is up to the non-moving party to present evidence to create a triable issue of fact. See *Guarino v. Brookfield Tp. Trustees*, 980 F.2d 399,403 (6th Cir., 1992); *In re Caneva,* 550 F.3d 755 , 761 (9th Cir., 2008). When the non-moving party does not present such evidence, the Court can correctly assume that no such evidence exists.

DBC did not produce or point to any evidence in their opposition brief regarding the work itself. DBC did not produce a declaration from a records custodian at either DBC or Universal of what portions of the films are identical or not identical.

In order to satisfy one of the elements of infringement, namely copying, DBC must produce evidence to demonstrate copying. See 9th Circuit Model Jury Instructions 17.5:

> "…Anyone who copies original expression from a copyrighted work during the term of the copyright without the owner's permission infringes the copyright. On the plaintiff's copyright infringement claim, the plaintiff has the burden of proving by a preponderance of the evidence that: 1. the plaintiff is the owner of a valid copyright; and 2. **the defendant copied original expression from the copyrighted work**. If you find that the plaintiff has proved both of these elements, your verdict should be for the plaintiff. If, on the other hand, you find that the plaintiff has failed to prove either of these elements, your verdict should be for the defendant.." (emphasis added).

It is not Huszar's burden to produce the evidence needed to prove DBC's case in chief. The expense of a trial is not warranted when the result will simply be a JMOL. (See *Antonick v. Elec. Arts, Inc*., 841 F.3d 1062, 1066 (9th Cir., 2016) entry of JMOL due to lack of the underlying

work not being in evidence.)

Huszar respectfully requests this Court enter summary judgment in his favor as DBC did not produce an admissible depository copy of the film *Dallas Buyers Club* by the close of discovery.

### C. DBC'S BUNTING RELIED ON EVIDENCE REQUESTED IN DISCOVERY BY DEFENDANT BUT NEVER PRODUCED BY PLAINTIFF

In support of DBCs opposition to rebut the expert testimony of Dr. Kal Toth, DBC has submitted an "expert report" from Stephen Bunting which was prepared for a completely difference case. (Docket 145-1). Mr. Bunting's report relies on test data and test scripts that were not provided to Huszar's counsel by the close of discovery. See Objections to Evidence *infra*.

Before the close of discovery, Huszar requested DBC produce a copy of the source code, documentation, test data, etc. that was used to validate and verify Huszar's IP address. (See Exhibit 2, Huszar's RPD Set 2). DBC objected to the production of the source code, but this Court entered a protective order. (Docket 116). The protective order was later modified. (Docket 137).

In their opposition, DBC produced a declaration from Bunting (Docket 145) that relies on test data that should have been produced by the close of discovery. Further, there is no evidence that Bunting prepared this declaration for this case, rather it was prepared for another case in the U.S. District Court for the Western District of Washington (WDWA). Bunting's conclusion is MaverickMonitor system "works". But Bunting's expert report is based on information from Ben Perino. Ben Perino has been disqualified as an expert by Judge Zilly in the WDWA finding that Ben Perino is unqualified as an expert and his testimony is unbelievable. Judge Zilly stated:

> (3) In response to the Minute Order entered November 3, 2017 (see, e.g., C17-988, docket no. 27), requiring plaintiff to provide an offer of proof, plaintiff has filed a declaration by Benjamin Perino, Chief Executive

>Officer of GuardaLey LTD, a German company. In such declaration, Perino asserts that he created the surveillance software at issue, which is licensed by GuardaLey to MaverickEye UG, also a German company. Perino Decl. at ¶¶ 5 & 11 (see, e.g., C17-988, docket no. 29). Perino has been proffered as an expert, but his qualifications consist of a technical high school education and work experience unrelated to the peer-to-peer file-sharing technology known as BitTorrent. Id. at ¶¶ 6-10. According to Perino, the infringement detection system at issue "cannot yield a false positive." Id. at ¶ 37. Perino does not have the qualifications necessary to be considered an expert in the field in question, and his opinion that the surveillance program is incapable of error is both contrary to common sense and inconsistent with plaintiff's counsel's conduct in other matters in this district. Plaintiff has not submitted an adequate offer of proof.

Bunting cannot rely on expert testimony from an unqualified expert, Ben Perino.

More importantly, after many discovery meetings, DBC's designated and produced their fact and expert witness, Robert Young. Robert Young testified that he never installed or executed the MaverickMonitor software on any server despite being designated by DBC as its 30(b)(6) designee on software. (See Exhibit 2 of MSJ, Dckt 138-2; Young Deposition, p. 106:15-18). DBC is bound by Young's 30(b)(6) testimony. Nowhere does Bunting rely on the evidence produced by Robert Young or testified about in his 30(b)(6) deposition.

Bunting does not recognize or address the architectural problems inherent in BitTorrent in conjunction with Tor. As documented in the article, **"BITSTALKER: ACCURATELY AND EFFICIENTLY MONITORING BITTORRENT TRAFFIC"** by Bauer, *et. al* (Edmondson Decl, Ex. 50, page 4, the problem with Tor false positives is clearly described in the article as follows:

>However, the active probing approach is not entirely immune from the possibility of false positive identification. For example, peers using an anonymizing network such as Tor [10] may produce false positives, since the last Tor router on the client's path of Tor routers (called a Tor exit router) would be implicated in the file sharing. In fact, a recent study has found that BitTorrent is among the most common applications used with Tor [11].

The Bauer article demonstrates Tor creates false positives in the context of bitTorrent use. This is exactly the scenario that Huszar's computer was experiencing. When Carl Crowell, the first of now four attorneys for DBC, demanded Huszar stop using Tor, Huszar complied. There is no evidence after that demand that the IP address continued to infringe the DBC work.

In conclusion, DBC should not be able to using Bunting's report, which relies on undisclosed evidence to support an opposition to Huszar's MSJ. Huszar respectfully requests this Court ignore the evidence proffered by Bunting and grant Huszar's motion for summary judgment.

### D. OBJECTIONS TO EVIDENCE

Huszar, pursuant to LR 56-1, notes this evidentiary objections to DBC's evidence presented in its Response in Opposition to Defendant's motion for summary judgment. Specifically, the Report of Stephen Bunting ("Bunting Report") attached as Exhibit 1 to Docket 145. The following objections apply to the Bunting Report:

- o Objection: Lacks Foundation. The Bunting Report relies on evidence and documents not included with the report, namely a report by Benjamin Perino which was not included as part of the Bunting Report. Further, the report was authored to support another case and it is not clear if the same system was used on both cases. It also relies upon documents and evidence requested in discovery by Huszar, but not produced by DBC prior to the close of discovery.

- o Objection: Hearsay. The Bunting Report relies upon out of court testimony, namely phone conversations from Ben Perino, as the basis for the truth of the matter asserted therein, namely that the MaverickMonitor system is reliable.

- o Objection: Lacks Personal Knowledge. The Bunting Report does not provide a computation of the false positive rate of the Maverick Monitor system, and therefore Mr. Bunting cannot testify as to that rate.

### III.   CONCLUSION

In view of the arguments and evidence presented above, as well as the evidence and arguments outlined in the moving papers, Huszar respectfully requests this Court grant his motion for summary judgment on the issue of infringement of the movie, *Dallas Buyers Club*. In the

alternative, Huszar respectfully requests the Court deny DBC's motion for summary judgment, as triable issues of material fact remain as to the contentions in DBC's motion for summary judgment.

DATED: April 30, 2018					Respectfully submitted,

							STEVENS & LEGAL, LLC

							/s/ Michael O. Stevens
							Michael O. Stevens, OSB No. 095198
							michael@hillsborofirm.com
							Attorney for Defendant